THE FLOWOOD CORPORATION *v.* CHAIN

No. 42643          May 6, 1963          152 So. 2d 915

*Murray & Bridges,* Brandon, for appellant.

436

*Hugh McIntosh, John D. Kervin,* Collins, for appellee.

KYLE, J.

C. W. Chain, plaintiff in the court below, recovered a judgment in the Circuit Court of Covington County against The Flowood Corporation, defendant in the court below, for the sum of $4,500, as damages for breach of a verbal contract for the growing of chickens. From that judgment the defendant has prosecuted this appeal.

The plaintiff, C. W. Chain, alleged in his declaration that on or about March 14, 1960, the defendant and the plaintiff entered into a verbal contract whereby the plaintiff agreed to grow the defendant's chickens on a commercial basis in consideration of a commission to be paid by the defendant to the plaintiff at a stipulated commission per pound and per chicken for all chickens grown by the plaintiff, individually, and for a stipulated commission for all of the defendant's chickens grown by subcontractors under the plaintiff's supervision; that the terms and conditions of the verbal contract were set out in full in a written unsigned contract, a copy of which was marked Exhibit "A" and was attached and made a part of the plaintiff's declaration. The plaintiff further alleged that, in addition to the terms and provisions of the agreement set out in the form contract attached as Exhibit "A", it was verbally agreed and understood by and between the plaintiff and the defendant as a part of the consideration of the contract, that the contract would be

irrevocable from the date the same was entered into on March 14, 1960, until May 1, 1961, and as long thereafter as it was necessary to grow to maturity all of the baby chickens on hand on May 1, 1961, whereupon the unsigned contract was modified accordingly.

The plaintiff further alleged that the contract and agreement set out in the exhibit was not signed by the plaintiff or the defendant for the reason that the plaintiff was not sure that the language of the contract was sufficient to make the same irrevocable as set out above; that the defendant and the plaintiff, however, agreed upon the terms and conditions of the typewritten contract verbally entered into the performance of the contract, except that the plaintiff and the defendant agreed verbally that the typewritten contract was modified and amended so as to make it an irrevocable contract as stated above; and that the parties continued to operate in the growing of chickens under the contract until the last week in November 1960.

The plaintiff further alleged that, in order to carry out the provisions of the contract, the plaintiff expended the sum of $3500 in the purchase of a used GMC truck and a new truck body, and the sum of $8500 for the construction of a chicken house, and the sum of $375 for the purchase of spray equipment and $95 for a lease of an unloading spur track at a railroad siding. The plaintiff further alleged that, from the date the contract was entered into, the plaintiff stored the defendant's feed at the plaintiff's warehouse in the Town of Mount Olive, grew the defendant's chickens, transported the defendant's feed and medication to the chicken growers under subcontracts, and the plaintiff individually grew and placed approximately 15,000 baby chicks per week for the defendant; that the plaintiff entered into subcontracts and grower's agreements with eight chicken growers in the community, and in all respect fulfilled the terms and conditions of the verbal contract until

the last week in November 1960, when the defendant without cause failed and refused to deliver to the plaintiff baby chickens in the Town of Mount Olive, and failed and refused to furnish and deliver feed and medication to the plaintiff's warehouse in the Town of Mount Olive, for the purpose of growing additional chickens under the terms and provisions of the verbal contract.

The plaintiff further charged that the defendant wilfully and wrongfully breached its contract in the last week in November 1960, in failing to continue to furnish chickens and supplies to the plaintiff as stated above, and that as a direct proximate result of the defendant's breach of the contract the plaintiff had suffered losses aggregating the sum of $7200 in commissions which the plaintiff would have collected on chickens grown by subcontractors, and losses aggregating the additional sum of $2500 in commissions which the plaintiff would have received from chickens grown by the plaintiff individually, had the provisions of the agreement been complied with. The plaintiff therefore sued and demanded judgment for the sum of $9700.

The defendant admitted in its answer that the defendant and the plaintiff had entered into an arrangement whereby the plaintiff was to grow the defendant's chickens on a commercial basis for a consideration, as specified in the form contract attached as an exhibit to the plaintiff's declaration, and the defendant admitted that the plaintiff grew chickens for the defendant until the last week of November 1960 under an oral agreement between them, the terms of which were substantially the same as the terms set forth in the plaintiff's exhibit. But the defendant denied that the parties agreed that such arrangement would be irrevocable, or that the defendant agreed to furnish chickens to the plaintiff at any time in the future. The defendant denied that it had entered into the contract alleged in

the plaintiff's declaration; but the defendant admitted that from March 14, 1960 until the last week in November 1960, the plaintiff had grown chickens for the defendant. The defendant denied that, without cause, it had failed and refused to deliver to the plaintiff baby chickens after the last week in November 1960, or that the defendant had failed and refused to deliver feed and medication to the plaintiff for the growing of additional chickens. The defendant averred in its answer that it had been forced to halt operations with the plaintiff because of the failure of the plaintiff to fulfill the terms and conditions of the agreement under which they were operating.

The defendant averred in its answer that the plaintiff failed to provide adequate housing for the growing of chickens as contemplated in the contract, or to properly feed, care for and attend to the chickens furnished him by the defendant, and that the failure of the plaintiff to properly perform the contract became so gross that in November 1960 the defendant was forced to withdraw its offer to contract with the plaintiff, and the defendant ceased furnishing chickens and other property to the plaintiff because of his failure to accept the contract tendered him and because of his failure and inability to perform the terms and conditions of the contract. The defendant filed with its answer a special plea in bar, in which it alleged that the contract sued on was a verbal contract which could not have been performed, and was not intended to be performed, within fifteen months from the making thereof, and accordingly was in violation of Section 264, Miss. Code of 1942, Rec., and no action could be brought thereon against the defendant for that reason.

The case was tried before a jury at the July 1962 term of the court.

The plaintiff, C. W. Chain, testifying in his own behalf, stated that he was engaged in the mercantile

business in Mount Olive, and that he handled machinery, appliances, seed, feed and fertilizer, and that he raised chickens for himself prior to the time that he entered into the contract with Flowood; that on or about March 14 or 15, 1960, he attended a meeting at Durward Corley's farm near Mize, Mississippi, with L. L. Hatten, a feed salesman, and Harry May, vice president of the Flowood Corporation, and an oral agreement was entered into between Flowood and the plaintiff whereby Flowood agreed to pay Chain for his services one cent per pound for chickens supplied by Flowood and fed and made ready for the market by Chain and his subcontractors. Flowood also promised to pay to Chain at the end of the accounting period a sum equal to 25 per cent of the net profits, if any, derived from the operation. Flowood was to furnish the chickens and deliver them to Chain to be placed with the growers in their chicken houses. Flowood was to furnish the feed and medication, and Flowood was to receive the money for the chickens. Flowood was to issue checks to the growers for the amounts that the growers were entitled to receive as compensation for their services. The amount to be paid to the growers for their services was a minimum of five cents per chicken. If the market price of the chickens sold was more than 16 cents per pound they would get an extra bonus. The growers were to furnish the labor to grow the chickens. Chain was to furnish the men to supervise the growing of the chickens. The chicken houses were to be approved by Flowood and Chain, or their supervisors. Flowood had the right to pack up the chickens at any time after they were placed in the chicken houses of the growers. Chain stated that chickens were placed on the Kennedy, Cole, Butler, Bryant and Thornton farms. Form contracts were later sent to Chain to be executed by the farmers with whom chickens were placed. Chain stated that Mr. May assured Chain and the growers who were

present at the Corley farm that the operation was not going to be one or two ''grow-outs''; that they were in the deal as long as Flowood was in the chicken business.

Chain stated that several weeks after the verbal contract was made, Fred Adams, Flowood's representative, who had charge of the broiler operation, came to his place of business and told him that Flowood had looked the deal over and had decided that ''they had made too good a contract, they couldn't live up to it.'' Chain stated that Adams told him that he had been around to see other growers, and all of them had agreed to discontinue the operation; and Adams wanted Chain to do the same. Chain stated that he told Adams that he had been out too much money to ''get prepared for this thing.'' Chain was then asked: ''What did you and Fred Adams, who represented Flowood, agree on and arrange on that occasion?'' His answer was: ''I told Fred that due to the expenses I had been out in preparing to get into this business that if they wanted to cancel me out at that time give me ten thousand dollars, which would about cover my expenses. Of course, he didn't do that, and we reached an agreement through him and finally went up there and it was confirmed by Harry May, that they were to furnish me fifteen thousand chickens a week to place with the farmers up to — they wouldn't place any chickens after May 31st, 1961, and that all chickens would be moved out by June 3rd, 1961.'' Chain stated that he and Mr. Ruffin went to Jackson and talked to Mr. May about the matter; that Mr. May told him that they had no intention of getting him out of the chicken business; that Mr. May assured him that they would furnish him chickens through June 30, 1961, and Mr. May told him that he saw no reason why the contract could not be renewed after that time. Chain was asked when this

happened. His answer was, "It was sometime prior to July 1960."

Chain stated that it was then that Flowood sent the unsigned written contract to him, which had the stipulation in it which showed that he would be in the chicken business through May 31, 1961. Chain was then requested to read to the jury the following provision of the contract: "Provided, however, that no baby chickens shall be furnished by the owner after May 1, 1961, and this contract shall terminate upon completion of growing of chickens furnished on said date." Chain was asked why he did not sign the contract and return it to Flowood. His answer was that he wanted to look at it, and it was never mentioned again. Chain stated that Flowood never requested his signature and he never requested theirs. Chain was asked whether he had a definite arrangement and agreement with Mr. May. His answer was, "Yeah, I had a definite arrangement and agreement they would furnish me 15,000 chickens per week from the time we got into this controversy til May 31st, 1961." Chain was asked whether or not he and Mr. May agreed that "this contract would not be binding until it was signed in writing." His answer was that they had no such agreement. Chain stated that, after he got his guarantee that Flowood would keep him in chickens until May 31, 1961, he built a new broiler house and expected to make enough money out of Flowood's chicken business to pay for that.

Chain was questioned concerning an exhibit which had been made a part of his answer to the interrogatories propounded to him by the defendant prior to the filing of the defendant's answer, which showed the number of chickens furnished by Flowood and the amount of money Flowood had paid to him and the growers during the period that he was in the chicken business with Flowood, from March 15, 1960, to November 1960. Chain stated that he had a net profit of a little over $12,000

— that was what he got out of it after he had paid the growers. His net profit amounted to about $330 a week. On cross examination Chain stated that he figured that he would have made $10,800, if he had gotten chickens placed for the 32 weeks after November 1960. He stated that after Flowood had terminated its contract he raised one batch of chickens for Dixie Broiler Association.

J. E. Ruffin, district sales manager in 1960 for Ralston Purina Company, testified that he went with Fred Adams to see Mr. Chain either in April or May 1960. Mr. Adams informed Mr. Chain that Flowood was going to have to change their original agreement, and that they would not be able to place any more chickens with him. Chain told Adams that he had entered into an agreement with Flowood for a year, and if Flowood did not want to put chickens down with him they could pay him $10,000, or they could continue to grow chickens with him, and he was going to enter suit against them for breach of contract. Ruffin stated that Adams told Chain that he had no authority to do anything other than what he had already done, and he would have to go back to Jackson and talk to Mr. May. Ruffin stated that he later went with Mr. Chain to Flowood's office to talk to Mr. May about the matter. That was the latter part of May or the first of June, and after Mr. May and Mr. Chain had discussed the matter, "Mr. May said that he would guarantee Mr. Chain that they would continue with him under the contract until June 1961," which was almost a year from that date. That satisfied Mr. Chain, and on the way back home Chain told Ruffin that he was going back and build a new broiler house.

Fred Adams testified that he worked for Flowood several weeks, from April 1 to the latter part of June 1960; that the latter part of April or the first of May, Mr. May instructed him to contact Mr. Chain about the

cancellation of the contract that he held in Mount Olive; that he went to see Mr. Chain and talked to him about the cancellation, and Mr. Chain told him that it was not agreeable to him that the contract be cancelled. Adams stated that after that Mr. Chain and Mr. Ruffin went to Flowood's office to discuss the matter. Adams was not present at the meeting, but Mr. May discussed the matter with him later, and Mr. May told him that he had agreed to continue the contract.

Several other witnesses were called to testify on behalf of the plaintiff. No witnesses were called to testify on behalf of the defendants.

The case was submitted to the jury under proper instructions of the court on the issues as to whether the plaintiff and the defendant had entered into a verbal contract for the growing of chickens which could have been performed within a period of fifteen months, and as to whether the Flowood Corporation had breached that contract by failing to furnish chickens and chicken feed to C. W. Chain according to the terms of the agreement. The jury returned a verdict for the plaintiff in the above stated amount of $4500, and a judgment was entered against the defendant for that amount.

The main points assigned and argued by the appellant's attorneys as grounds for reversal of the judgment of the lower court are: (1) That the lower court erred in holding that the contract sued on was a valid contract and not violative of paragraph (d) of Section 264, Mississippi Code of 1942, Rec., being the first section of the Statute of Frauds; (2) that the court erred in holding that the evidence offered on behalf of the plaintiff was sufficient to prove the existence of the contract upon which the suit was based, and that the verdict of the jury in finding that such contract did exist was contrary to the overwhelming weight of the evidence; and (3) that the amount of the verdict and the judgment entered thereon was excessive.

We think there was no error in the refusal of the trial judge to hold as a matter of law that the contract sued on was violative of subparagraph (d) of Section 264, Code of 1942.

■■ It is not necessary that we consider the question whether or not the agreement entered into in March 1960 fell within the Statute of Frauds, or the question whether or not Chain could have maintained successfully a suit against Flowood for a breach of the contract entered into during the month of March. The evidence shows without dispute that Flowood and Chain settled the controversy engendered by Flowood's proposal to cancel the verbal contract entered into in March 1960, by the negotiation of a new agreement sometime during the month of June or July whereby Flowood agreed to furnish Chain 15,000 chickens a week to place with the farmers up to May 1, 1961, and that all chickens should be moved out by June 3, 1961. Whether that agreement be referred to as a modification of the original contract or a new contract is not a matter of importance here. It was an agreement, definite in its terms, which satisfied both parties and which was to be performed within a space of fifteen months from the making thereof, and was not within the Statute of Frauds.

■■ It is argued, however, that the court erred in admitting, over the appellant's objection, testimony by Chain and his witness Ruffin concerning the ancillary agreement entered into between the appellat and the appellee sometime during the month of May or June, 1960, in settlement of the controversy which had arisen between them as a result of Flowood's attempt to cancel the contract because "they had made too good a contract," and Flowood "couldn't live up to it." It is argued that the testimony concerning the later agreement was at variance with the pleadings and that the testimony should have been excluded for that reason. But we think there is no merit in that contention. The

declaration alleged that, in addition to the terms and provisions of the agreement set out in the unsigned form contract, it was verbally understood and agreed by and between the parties that the verbal contract would be irrevocable from the date thereof until May 1, 1961, and as long thereafter as was necessary to grow to maturity all of the baby chickens on hand on May 1, 1961, and that the contract was modified accordingly. The appellant filed no motion for a bill of particulars or to have the pleading made more specific; and we think the appellant's objections to the testimony of Chain and the witness Ruffin relating to the renegotiation and modification of the contract after Chain had refused to agree to the cancellation of the contract were properly overruled. ██ █ We also think there was no error in the court's holding that the evidence offered on behalf of the plaintiff was sufficient to prove the existence of the contract upon which the suit was based.

██ █ We also think there is no merit in the appellant's contention that the verdict of the jury awarding damages to the plaintiff in the sum of $4500 was contrary to the weight of the evidence or so excessive as to evince bias or prejudice on the part of the jury. The evidence offered on behalf of the plaintiff concerning the net profits which he had derived from his operations under the verbal contract from March 1960 to the latter part of November 1960, furnished a sufficient basis to support a finding in favor of the plaintiff for damages on account of loss of profits for the period from December 1, 1960 to May 1, 1961; and we think the data furnished by the plaintiff was sufficient for an approximate estimate of the amount of damages.

In Montgomery Ward & Co. v. Hutchinson, 173 Miss. 701, 708, 159 So. 862, 863, the Court said: "A party who has broken his contract cannot escape liability because of the difficulty in finding a perfect measure of damages. It is enough that the evidence furnishes suf-

ficient data for an approximate estimate of the amount of damages. * * * When a verdict is sustained by the reasonable probabilities growing out of the evidence, the judgment is not to be defeated by showing that there is this or that or the other possibility which would point to a contrary verdict.''

We find no reversible error in the record and the judgment of the lower court is affirmed.

Affirmed.

*McGehee, C. J., and Arrington, Ethridge and Gillespie, JJ.,* concur.